Jonathan K. Levine (SBN 220289)
Elizabeth C. Pritzker (SBN 146267)
**PRITZKER LEVINE LLP**
180 Grand Avenue, Suite 1390
Oakland, CA 94612
Tel:    (415) 692-9772
Fax:    (415) 355-6110
Email:  jkl@pritzkerlevine.com
Email:  ecp@pritzkerlevine.com

Thomas J. McKenna (*pro hac* pending)
Gregory M. Egleston (*pro hac* pending)
**GAINEY McKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:    (212) 983-1300
Fax:    (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| ALAN BANKHALTER, Derivatively on Behalf of Nominal Defendant APPLE INC., ) ) ) | CASE NO.: |
| Plaintiff, ) ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. ) ) | |
| TIMOTHY D. COOK, LUCA MAESTRI, CRAIG FEDERIGHI, ARTHUR D. LEVINSON, ALBERT GORE, JR., ANDREA JUNG, JAMES A. BELL, RONALD D. SUGAR, ROBERT A. IGER, AND SUSAN L. WAGNER, ) ) ) ) ) ) ) ) | |
| Defendants, ) ) | **JURY TRIAL DEMANDED** |
| APPLE INC., a California Corporation, ) ) | |
| Nominal Defendant. ) | |

Plaintiff Alan Bankhalter ("Plaintiff"), on behalf of Apple, Inc. ("Apple" or the "Company"), derivatively, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief and investigation of counsel as to all other matters. That investigation included, among other things, a thorough review and analysis of public documents, court filings, press releases and news articles concerning Apple, and the other facts as set forth herein:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of Apple, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties.  Defendants' actions have caused, and will continue to cause, substantial financial harm and reputational damage to Apple.

2.      The Company is a multinational technology company headquartered in Cupertino, California that designs, develops, and sells consumer electronics, computer software, and online services.  The Company's most well-known products include its iPhone smartphones, the iPad tablet computer, the Mac personal computer, the iPod portable media player, the Apple Watch smartwatch, the Apple TV digital media player, and the HomePod smart speaker.

3.      The multiple versions and models of the Company's iPhone have served as its flagship product, using the Company's iOS operating system, powering applications including Siri, an intelligent assistant, and Apple Pay, Touch ID, and Face ID on qualifying devices.  Sales of iPhones generated approximately two-thirds of the Company's 2018 revenue.[1]  Since its original launch in 2007 through 2015, the Company released, on average, one new iPhone model per year. The Company also increased the pricing of its iPhones from the $99-$399 range maintained through 2013 to a top offering price of $1,449 for the Apple XS Max with 512 gigabytes in September 2018.

4.      The Company and its products enjoy great geographic reach, including in emerging markets.  For example, greater China – a region that includes mainland China, Hong Kong, and

---

[1] The Company's fiscal year ends in September of each calendar year.  The Company's 2018 fiscal year began on September 31, 2017 and ended on September 29, 2018.

Taiwan – is Apple's third-largest market after the United States and Europe, accounting for $52 billion in sales in Apple's fiscal year 2018 ("FY18"), ended September 29, 2018 – nearly 20% of Apple's total FY18 annual sales.  But, while China represents the Company's highest growth market, China is also among its most competitive.  Chinese upstart brands such as Huawei, Xiaomi and Oppo offer similar looking all-screen phones for much lower prices.  At the same time that Apple's iPhone sales revenues were growing in China due to Apple's outsized price increases, Chinese smartphone manufacturers were launching scores of much lower priced smartphones with greater advancements throughout the Chinese market, thus competing with Apple's iPhone offerings and diminishing the Company's pricing power.

5.      In addition, Apple's business in China is also more susceptible to geopolitical trade maneuvers by the United States and China, and, more recently, tariffs imposed by the United States have also threatened sales.  For example, on April 3, 2018, the Trump Administration published a list of $50 billion in Chinese products under consideration for a 25% tariff and, on July 6, 2018, implemented the first $34 billion of those import tariffs.  On July 10, 2018, the Trump Administration announced a list of another $200 billion in Chinese products that would be subject to a 10% import tariff.  On July 20, 2018, President Trump announced he was ready to impose tariffs on all U.S. imports from China, which totaled $504 billion in 2017. On August 7, 2018, the Trump Administration subjected the remaining $16 billion of the original $50 billion list of Chinese imports to the 25% tariff effective August 23, 2018. On September 17, 2018, the Trump Administration published a list of another $200 billion in Chinese products that would be subject to a 10% import tariff, which tariffs went into effect on September 24, 2018.

6.      In the midst of the ongoing trade war between the United States and China, on September 12, 2018, Apple introduced three new phones: the iPhone XR, the iPhone XS, and the iPhone XS Max.  Unlike the prior iPhone releases, the 2018 iPhones were not viewed as having significant technological advances beyond the iPhone X released in late 2017.  The iPhone XS and XS Max that were launched and began shipping in September 2018 featured a Super Retina OLED display, an all-screen stainless steel and glass design, faster processors and enhanced cameras.  The

highest gigabyte version of the iPhone XS Max launched at a price of $1,449 – $300 more than the 2017 highest gigabyte version of the iPhone X.

7.     At the same time, Chinese manufacturers like Huawei, Oppo, and Xiaomi, which have since commandeered 24.6%, 20.5%, and 13.6% of the Chinese market, respectively, were slashing Apple's Chinese market share to 7.5% by offering more innovative features for hundreds of dollars less per phone.  For instance, Huawei's P20 Pro sells for approximately $800 in China and Xiaomi's MIX 2S sells for approximately $500 in China.

8.     The strength of the U.S. dollar and the high price of iPhones, combined with a declining Chinese economy, placed the iPhone out of reach of many Chinese consumers who might otherwise have upgraded – at the same time that many less expensive Chinese smartphones were flooding the market.

9.     Making matters worse, in December 2017, the Company admitted that it had been intentionally degrading, or "throttling," the performance of the batteries in older iPhones via software "updates."  This battery "throttling" had created artificial demand for new premium priced iPhones from consumers who believed their poorly performing iPhones were outdated and thus needed to be replaced.  In order to stymie customer outrage over its conduct, starting in January 2018, the Company dramatically cut the price of iPhone battery replacements from $79 to $29 "'for anyone with an iPhone 6 or later whose battery need[ed] to be replaced, available worldwide through December 2018'" – right as Apple would be debuting its three new iPhones.

10.     Notwithstanding the impact of slowing economic growth in China, geopolitical pressures caused by U.S.-China sales tariffs, and the Company's ability to compel unnecessary iPhone upgrades on customers, Apple issued a series of false and misleading statements in November 2018 regarding demand for iPhones and Apples pricing power for its hardware offerings, including its new iPhones launched in September 2018, in particular in China.

11.     For example, on November 1, 2018, the Company reported its fourth quarter and FY18 financial results for the period ended September 29, 2018.  The Company boasted that "'[o]ver the past two months, [it had] delivered huge advancements for [its] customers through new

versions of iPhone, Apple Watch, iPad and Mac as well as [its] four operating systems,'" and that as a result, it had "'enter[ed] the holiday season with [its] strongest lineup of products and services ever.'"  Based in large part on this lineup of products, on November 1, 2018 – more than one-third of the way through Apple's first quarter of 2019 ("1Q19") – Apple set its 1Q19 revenue expectations in a range of $89 billion to $93 billion and its gross profit margins at 38% to 38.5%.

12.     During a conference call for analysts and investors held later that day, when asked whether the U.S.-China trade tariffs and trade tariff threats were having any impact on demand for iPhones in China, Defendant Timothy D. Cook ("Cook") assured investors that the only "emerging markets that [Apple was] seeing pressure in [were] markets like Turkey, India, Brazil, [and] Russia . . . where currencies ha[d] weakened."  Defendant Cook reported, however, "[i]n relation to China specifically, I would not put China in that category.  Our business in China was very strong last quarter.  We grew 16%, which we're very happy with.  iPhone, in particular, was very strong double-digit growth there."

13.     In addition to the Company's 1Q19 financial outlook, during the November 1, 2018 conference call, the Company surprised the market by reporting that Apple would no longer disclose unit sales for iPhones and other hardware, asserting that such data was no longer relevant for investors to evaluate the Company's financial performance, all the while assuring investors that despite the decision to withhold unit sales data, as in the past, the Company would still experience strong performance:

> [S]tarting with the December quarter, we will no longer be providing unit sales data for iPhone, iPad and Mac. . . .  As we accomplish these objectives, strong financial results follow.
>
> As demonstrated by our financial performance in recent years, the number of units sold in any 90-day period is not necessarily representative of the underlying strength of our business.  Furthermore, our unit of sale is less relevant for us today than it was in the past . . . .

14.     Each of the statements set forth above was materially false and misleading when made because Defendants knew and failed to disclose or deliberately disregarded:

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5

(a)     that the U.S.-China trade war had negatively impacted demand for iPhones and Apple's pricing power in greater China, one of Apple's most important growth markets;

(b)     that the rate at which Apple customers were replacing their batteries in older iPhones rather than purchasing new iPhones was negatively impacting Apple's iPhone sales growth;

(c)     that, as a result of slowing demand, Apple had slashed production orders from suppliers for the new 2018 iPhone models and cut prices to reduce inventory;

(d)     that unit sales for iPhone and other hardware was relevant to investors and the Company's financial performance, and the decision to withhold such unit sales was designed to and would mask declines in unit sales of the Company's flagship product; and

(e)     that, as a result of the foregoing, Defendants lacked a reasonable basis in fact when issuing the Company's revenue outlook for 1Q19 and/or making the related statements concerning demand for its products, as Apple's business metrics and financial prospects were not as strong as Defendants had led the market to believe.

15.     While the Company's mid-point 1Q19 revenue guidance range provided on November 1, 2018 was $1.9 billion below what the market expected, Defendants' materially false and misleading statements issued that day served to prop up the market price of Apple common stock, which continued to trade at artificially inflated prices.

16.     Then, on January 2, 2019, the Company shocked the market when it disclosed the true state of its actual 1Q19 iPhone sales, particularly in China.  For the first time during Defendant Cook's tenure as Chief Executive Officer ("CEO"), the Company would miss its public revenue projections and the miss was up to $9 billion. The Company would admit that in addition to macroeconomics in the Chinese market, the price cuts to battery replacements a year earlier to fix the Company's prior surreptitious conduct had hurt iPhone sales.  In a "Letter from Tim Cook to Apple Investors" released after the close of trading, the Company explained as follows:

//

//

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

6

**Emerging Market Challenges**

While we anticipated some challenges in key emerging markets, ***we did not foresee the magnitude of the economic deceleration, particularly in Greater China.***

***In fact, most of our revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China across iPhone, Mac and iPad***.

***China's economy began to slow in the second half of 2018.*** The government-reported GDP growth during the September quarter was the second lowest in the last 25 years.  We believe the economic environment in China has been further impacted by rising trade tensions with the United States. As the climate of mounting uncertainty weighed on financial markets, the effects appeared to reach consumers as well, with traffic to our retail stores and our channel partners in China declining as the quarter progressed.  And ***market data has shown that the contraction in Greater China's smartphone market has been particularly sharp***.

\* \* \*

**iPhone**

Lower than anticipated iPhone revenue, primarily in Greater China, accounts for all of our revenue shortfall to our guidance and for much more than our entire year-over-year revenue decline . . . .

While Greater China and other emerging markets accounted for the vast majority of the year-over-year iPhone revenue decline, in some developed markets, ***iPhone upgrades also were not as strong as we thought they would be***. While macroeconomic challenges in some markets were a key contributor to this trend, ***we believe there are other factors broadly impacting our iPhone performance***, including consumers adapting to a world with fewer carrier subsidies, US dollar strength-related price increases, and ***some customers taking advantage of significantly reduced pricing for iPhone battery replacements***.  [Emphasis added].

17.     This news caused the market price of the Company common stock to plunge, closing down more than $15 per share, or more than 9%, from its close of $157.92 per share on January 2, 2019 to close at $142.19 per share on January 3, 2019, on unusually high volume of more than 90 million shares traded.

## JURISDICTION AND VENUE

18.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of

sections 10(b) and 20(a) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

19.     The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in California or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, including Nominal Defendant Apple, a substantial portion of the transactions and wrongs complained of herein – including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Apple – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

21.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

**INTRADISTRICT ASSIGNMENT**

22.     Assignment to the San Jose Division is appropriate under Local Rule 3-2(c) because related cases against Apple and certain of its directors and officers, alleging substantially similar facts, are now pending before Judge Edward J. Davila in the San Jose courthouse.  *See Zehrer v. Cook*, 19-cv-05153-EJD; *In re Apple Inc. Device Performance Litigation*, 18-md-02827-EJD.

**PARTIES**

**Plaintiff**

23.     ***Plaintiff Alan Bankhalter*** is a current Apple shareholder during the relevant period. Plaintiff will continue to hold Apple shares throughout the pendency of this action.  Plaintiff will

fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

24.     Nominal Defendant Apple is a California corporation with principal executive offices located at One Apple Park Way, Cupertino, California.  Apple designs, manufactures, and markets mobile communication and media devices and personal computers, and sells a variety of related software, services, accessories, and third-party digital content and applications.

**Director Defendants**

25.     *Defendant Timothy D. Cook* ("Cook") is, and was at all relevant times, CEO of the Company and a member of its Board of Directors (the "Board").

26.     *Defendant Arthur D. Levinson* ("Levinson") is the Company's Chairman of the Board and has been since November 2011 and has been a director since August 2000.  Defendant Levinson was also the Company's co-lead director from 2005 to November 2011.  Defendant Levinson is a member of the Company's Audit and Finance Committee and has been since at least January 2017.

27.     *Defendant Albert Gore, Jr.* ("Gore") is a director of the Company and has been since March 2003.  Defendant Gore is also a member of the Company's Nominating and Corporate Governance ("N&CG Committee") and has been since at least January 2017.

28.     *Defendant Andrea Jung* ("Jung") is a director of the Company and has been since January 2008.  Defendant Jung is also a member of the Company's N&CG Committee and has been since at least January 2017.

29.     *Defendant James A. Bell* ("Bell") is a director of the Company and has been since October 2015.   Defendant Bell is a member of the Company's Audit and Finance Committee and has been since at least January 2017.

30.     *Defendant Ronald D. Sugar* ("Sugar") is a director of the Company and has been since November 2010.  Defendant Sugar is the Chair of the Company's Audit and Finance Committee and has been since at least January 2017.

31.     **Defendant Robert A. Iger** ("Iger") is a director of the Company and has been since November 2011. Defendant Iger is the Chair of the Company's N&CG Committee and has been since at least January 2017.

32.     **Defendant Susan L. Wagner** ("Wagner") is a director of the Company and has been since July 2014.  Defendant Wagner is a member of the Company's Audit and Finance Committee and has been since at least January 2017.

33.     Defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger and Wagner are collectively referred to herein as "Director Defendants."

**Officer Defendants**

34.     **Defendant Luca Maestri** ("Maestri") is the Company's Senior Vice President and Chief Financial Officer ("CFO") and has been since May 2014. Defendant Maestri was also the Company's Vice President and Corporate Controller from March 2013 to May 2014.

35.     **Defendant Craig Federighi** ("Federighi") is the Company's Senior Vice President, Software Engineering and has been since August 2012.  Defendant Federighi was also the Company's Vice President, Mac OS Engineering from April 2009 to August 2012, and Director of Engineering from 1997 to February 1999.

36.     Defendants Maestri and Federighi are herein referred to as the "Officer Defendants."

37.     The Director Defendants and Officer Defendants are collectively referred to herein as the "Defendants."

**Audit Committee Charter**

38.     Pursuant to the Company's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board with oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements.

39.     The Audit Committee Charter states in relevant part:

//

//

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**E.      Duties and Responsibilities**

The Committee shall:

**Independent Auditor**

1.      Appoint, compensate, retain, and oversee the work of the independent auditors (including resolving disagreements between management and the independent auditors regarding financial reporting) for the purpose of preparing or issuing an audit report or related work.

2.      Pre-approve all audit and permissible non-audit services to be provided to the Corporation by the independent auditors, as set forth in Section 10A of the Exchange Act and the rules and regulations promulgated thereunder by the SEC. The Committee shall have the sole authority to approve the hiring and firing of the independent auditors and all fees and terms of audit and non-audit engagements with the independent auditors, in each case as may be permissible and compatible with the auditors' independence. The Committee shall also review and approve disclosures with respect to non-audit services.

3.      Review and provide guidance with respect to the external audit and the Corporation's relationship with its independent auditors by:

- reviewing the independent auditors' proposed audit scope, approach and independence;
- obtaining on a periodic basis a statement from the independent auditors regarding relationships and services with the Corporation which may impact independence and presenting this statement to the Board, and to the extent there are relationships, monitoring and investigating them;
- ensuring that the independent auditors submit to the Committee on an annual basis a written statement (consistent with the applicable requirements of the Public Company Accounting Oversight Board) delineating all relationships and services that may impact the objectivity and independence of the independent auditors; and
- reviewing reports submitted to the Committee by the independent auditors in accordance with applicable SEC requirements.

4.      Obtain and review an annual report from the independent auditors describing (i) the independent auditors' internal quality control procedures and (ii) any material issues raised by the recent internal quality control review, peer review, or Public Company Accounting Oversight Board review, of the independent auditors, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the independent auditors, and steps taken to deal with any such issues.

5.      Review the experience and qualifications of the senior members of the independent auditor team.

6.      Review and concur with the Corporation's hiring of employees of the independent auditor who were engaged on the Corporation's account.

7.      Review the qualifications, independence, performance, and fees of the independent auditors on an annual basis, including a review and evaluation of the lead partner of the independent auditor.

8.      Periodically discuss with the independent auditors any matters appropriate or required to be discussed under applicable accounting and auditing professional standards or applicable regulations, including auditing standards adopted by the Public Company Accounting Oversight Board. These discussions shall include (i) the independent auditors' judgments about the quality, appropriateness, and acceptability of the Corporation's accounting principles and financial disclosure practices, as applied in its financial reporting, and (ii) the completeness and accuracy of the Corporation's financial statements.

**Financial Reporting**

9.      Review with management and the independent auditor:

- the Corporation's annual audited financial statements, and related footnotes, and quarterly unaudited financial statements, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Corporation's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;
- the independent auditors' audit of the annual financial statements and their report thereon;
- the accompanying management letter and any reports with respect to interim periods;
- any material changes to the Corporation's accounting principles and practices used in preparing financial statements to be filed with the SEC;
- any significant changes required in the independent auditors' audit plan;
- any difficulties or disputes with management encountered during the course of the audit; and
- other matters related to the conduct of the audit that are to be communicated to the Committee under the auditing standards of the Public Company Accounting Oversight Board.

10.      Review with management, the independent auditors, and the Corporation's counsel, as appropriate, any legal and regulatory matters that may have a material

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

12

impact on the financial statements, related compliance policies, and programs and reports received from regulators.

11.     Review and discuss earnings press releases, including the use of non-GAAP financial measures, prior to public disclosure.

12.     Provide a report for inclusion in the Corporation's proxy statement in accordance with the rules and regulations of the SEC.

13.     Oversee compliance with the requirements of the SEC for disclosure of auditors' services and audit committee member qualifications and activities.

14.     Discuss with the independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and disagreements with management and any other matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 1301 ("Communications with Audit Committees") and Rule 2-07 of SEC Regulation S-X ("Communication with audit committees"), as in effect at the time in the case of annual statements, and Statement on Auditing Standards No. 100, as in effect at the time in the case of quarterly statements.

**Internal Control Over Financial Reporting and Disclosure Controls and Procedures**

15.     Review the adequacy of the Corporation's internal control over financial reporting and the disclosure controls and procedures designed to ensure compliance with applicable laws and regulations.

16.     Consider and review with the independent auditor and the head of Internal Audit the adequacy of the Corporation's internal controls and any related significant findings and recommendations of the independent auditor and internal auditors together with management's responses thereto.

17.     Periodically review with management any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting, any fraud involving any employees who have a significant role in the Corporation's internal control over financial reporting, and any significant changes in internal controls over financial reporting or in other factors that could significantly affect internal controls over financial reporting, including management's responses thereto.

18.     Establish procedures for receiving, retaining and treating complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

**Nominating and Corporate Governance Committee Charter**

40.     Pursuant to the Company's Nominating and Corporate Governance Committee ("N&CG") Charter, the purpose of the N&CG Committee is to: "1. Consider and report periodically to the Board on matters relating to the identification, selection and qualification of Board members and candidates nominated to the Board; and 2. Advise and make recommendations to the Board of Directors with respect to corporate governance matters."

41.     The duties of the N&GC Committee are:

1.     Screen and recommend the selection of nominees to the Board to fill vacancies and newly created directorships based on, among other things, their independence, character, ability to exercise sound judgment, diversity, age, demonstrated leadership, skills, including financial literacy, and experience in the context of the needs of the Board. The Committee is committed to actively seeking out highly qualified women and individuals from minority groups to include in the pool from which Board nominees are chosen.

2.     Develop a pool of potential director candidates for consideration in the event of a vacancy on the Board.

3.     Oversee the annual Board performance evaluation process, including conducting surveys of director observations, suggestions and preferences.

4.     Consider the performance of incumbent members of the Board in determining whether to recommend that they be nominated for reelection.

5.     Evaluate and recommend termination of membership of individual directors in accordance with the Corporation's Bylaws, for cause or for other appropriate reasons.

6.     Make recommendations to the Board concerning the size, structure and composition of the Board and its committees.

7.     Consider shareholder nominees for election to the Board and review shareholder proposals submitted to the Corporation for consideration at the Corporation's annual meeting of shareholders.

8.     Monitor compliance with the Guidelines Regarding Director Conflicts of Interest and, as it relates to individual directors, the Corporation's Business Conduct Policy.

9.     Consider matters of corporate governance and periodically review the Corporation's corporate governance policies and recommend to the Board modifications to the policies as appropriate.

10.     Review the Committee's charter, structure, processes, and membership requirements and submit any recommended changes to the Board at least once a year.

11.     Review the Corporate Governance Guidelines annually and submit any recommended changes to the Board.

12.     Report to the Board concerning the Committee's activities with such recommendations as the Committee deems appropriate at least once a year.

13.     Perform such other functions as assigned by law, the Corporation's charter or bylaws, or the Board.

**SUBSTANTIVE ALLEGATIONS**

42.     As admitted by the Company in its 2016 Form 10-K at page 9:

"The Company's financial condition and operating results depend substantially on the Company's ability to continually improve iOS and iOS devices in order to maintain their functional and design advantages."

43.     In line with the Company's admitted emphasis on iOS, it issued numerous updates to iOS from the initial sale of each of the devices and continuing through to the present date.  The following outlines the various main versions of iOS released for one or more of the devices since June 11, 2012.  Major updates to iOS, such as iOS 6, 7, 8, 9, 10, 11 and 12, are generally announced by the Company via press releases and Special Event presentations

44.     As further detailed herein, it was the Company's constant release of these updates, each with new features and requiring a further draw on the batteries and processor chips of the devices to run that contributed to the defects.

45.     With regard to the devices at issue herein, the Company kicked off (for certain of the iPads) with iOS 6.

46.     On June 11, 2012, Defendants caused the Company to issue a press release, reporting that iOS 6 would be released in the Fall of 2012, and would introduce 200 new features.

47.     On January 28, 2013, Defendants caused the Company to issue a press release, reporting "Apple Updates iOS to 6.1." and promising that users could experience "ultrafast wireless

performance to browse, download and stream content at blazing fast speeds."  Further, the Company represented that:

> iOS 6 is the world's most advanced mobile operating system, and with nearly 300 million iPhone, iPad and iPod touch devices on iOS 6 in just five months, it may be the most popular new version of an OS in history," said Philip Schiller, Apple's senior vice president of Worldwide Marketing.  "iOS 6.1 brings LTE support to even more markets around the world, so even more users can enjoy ultrafast Safari browsing . . .

* * *

**Availability**

> iOS 6.1 is available as a free software update today. iOS 6.1 is compatible with iPhone 5, iPhone 4S, iPhone 4, iPhone 3GS, iPad (third and fourth generation), iPad mini, iPad 2 and iPod touch (fourth and fifth generation).

48.     On June 10, 2013, the Company unveiled iOS 7.  The Company represented iOS 7 as "the most significant iOS update since the original iPhone, featuring a stunning new user interface."  Further, according to Jony Ive, the Company's senior vice president of Design, iOS 7 has "a profound and enduring beauty in simplicity, in clarity, in efficiency."

49.     On September 10, 2013, Defendants caused the Company to issue a press release, reporting that iOS 7 would be available for the public to download on September 18, 2013 for "iPhone, iPad and iPod touch users as a free software update."  The release represented that "iOS 7 has been engineered with deep technical and design integration with both the iPhone 5s and iPhone 5C" as:

> Apple engineered iOS 7 to take full advantage of the advanced 64-bit technologies in iPhone 5s, including the native 64-bit kernel, libraries and drivers.  Al the built-in apps have been re-engineered for 64-bit, and iOS 7 provides a seamless developer transition with Xcode support and the ability to run both 32-bit and 64-bit apps.

50.     On June 2, 2014, Defendants caused the Company to issue a press release, "unveiling" of iOS 8, stating, in pertinent part, that it provided a "simpler, faster and more intuitive user experience."  Another press release on iOS 8 was released on September 9, 2014 reiterating this same statement.

51.     The Company also featured iOS 8 during a June 15, 2015 Apple Special Event it hosted in San Francisco, California, where Defendant Federighi, SVP, Software Engineering stated:

> Next, you guessed it, iOS.  Now our current big release of iOS is iOS 8 and iOS 8 was a huge release with tons of new features for users and a phenomenal set of technologies . . . .  So, we're now looking forward to iOS 9 and as we can see of what we wanted to accomplish, first and foremost, we wanted to elevate the foundations of the platform.  Things like extending your battery life, improving performance and enhancing security to protect customer data.[2]

52.     On June 8, 2015, Defendants caused the Company to issue a press release, reporting the "preview" of iOS 9.  The release stated in pertinent part:

> iOS 9 makes the foundation of iOS even stronger with refinements including battery optimization that provides a typical user with an additional hour of battery life, and a low-power mode to help further extend battery life.

53.     On the same day, at the Apple WWDC 2015 Keynote, Defendant Federighi stated the following about iOS 9:

> Now with battery life, we focused on real-world use cases and optimized them, and we're seeing an addition of one hour of typical use on a full charge on iPhone.  Now we know that for a lot if you're running low on power, you start searching all over for switches and turning off features in the hope of extending your battery life, a little bit further.  Well now in iOS 9 we give you a single switch in what we call low-power mode.  It pulls levers that you didn't even know existed and is able to extend battery life for additional three hours of typical use on top of that additional hour.  It's really great.[3]

54.     On September 9, 2016, Defendants caused the Company to issue a press release, reporting that iOS 9 was available for download starting September 16, 2016.   Apple also represented iOS 9 as:

> [T]he world's most advanced mobile operating system, will be available on Wednesday, September 16 as a free update for iPhone, iPad and iPod touch users.  iOS 9 makes iOS devices more intelligent and proactive with powerful search and improved Siri features, all while protecting users' privacy.
>
> The way you interact with iPad gets even better with iOS 9, thanks to new multitasking features . . .  Built-in apps become more powerful . . .

---

[2] C. Federighi, SVP, Software Engineering, Apple Special Event (June 15, 2015).
[3] C. Federighi, SVP, Software Engineering, Apple, Apple WWDC 2015 Keynote.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17

'iOS 9 is packed with intelligence that makes every experience with iPhone and iPad even more powerful — Siri can do more than ever and new proactive assistance helps you get more done before you ask, all while protecting users' privacy," said Craig Federighi, Apple's senior vice president of Software Engineering. "With iOS 9 we focused on strengthening the foundation of iOS with a deep focus on quality, and with the help of more than one million users who participated in our first ever public beta program, we're excited to release the best version of iOS yet.'

* * *

**iPad Experience**

iOS 9 delivers new multitasking features designed specifically for iPad that allow you to do even more . . . .

* * *

This latest release makes the foundation of iOS even stronger with refinements including battery optimization that provides a typical user with an additional hour of battery life, and a low-power mode to further extend battery life.

55.     Notably, the Company developed it A9 chip and iOS 9 together "for optimal performance where it matters most, in real world usage."[4]

56.     On June 13, 2016, Defendants caused the Company to issue a press release, previewing iOS 10, "the biggest iOS release ever."  In iOS 10, the Company purported to make "accessing the information you need is easier and quicker than ever."  The release also featured "'beautifully redesigned apps for Music, Maps, and News that are more intuitive and more powerful, making everything you love about your iPhone and iPad even better,' said Craig Federighi, Apple's senior vice president of Software Engineering."  iOS 10 also "increase[ed] security and privacy with powerful technologies like Differential Privacy."

57.     On January 23, 2017, Defendants caused the Company to issue a press release announcing the release of iOS 10.2.1.  Shortly thereafter, Defendants caused the issuance of a notification to appear on the devices advising that iOS 10.2.1 was available for installation.  As alleged herein, iOS 10.2.1 was designed by Apple to throttle the devices, contrary to what Apple stated about the update.

---

[4] Apple iPhone 6 Press Release (Sept. 9, 2015).

58.     On September 18, 2017, Defendants caused the Company to issue a press release reporting the availability of iOS 11.  As stated in the release:

> Starting Tuesday, iPhone and iPad customers around the world will be able to update their devices to iOS 11, a major update to the world's most advanced mobile operating system and the biggest software release ever for iPad.

59.     According to later reports by the Company at the 2018 WWDC: "iOS 11 supports devices that were introduced as far back as 2013, like the iPhone 5S.  And we just love the way customers race to update to our newest releases.  In fact, half of our customers upgraded to iOS 11 in just seven weeks.  It's incredible.  Now as we stand here today, 81 percent of our over a billion active iOS devices are running our latest release."

60.     On December 2, 2017, the Company announced the release of iOS 11.2.0.  Shortly thereafter, the Company caused the issuance of a notification to appear on the devices advising that IOS 11.2.0 was available for installation.

61.     As alleged herein, iOS 11.2.0 was another update designed to throttle the devices and exacerbate the defects.

62.     Just weeks after the issuance of iOS 11.2.0, the Company was forced to issue the December 20 admission, followed eight days later by an apology.  In a series of the updates issues after 11.2.0 (including, but not limited to, 11.2.1, and the 11.3 and 11.4 series), the Company proceeded to attempt to cover its tracks, though failing to admit the defects.  The Company's latest software machination is iOS 12.

63.     On June 4, 2018, Defendants caused the Company to issue a press release, reporting iOS12, which stated that the update:

> [I]s designed to make everyday tasks on iPhone and iPad faster and more responsive with performance improvements across the system.  Camera launches up to 70 percent faster, the keyboard appears up to 50 percent faster and typing is more responsive. Even when there is a lot going on across the system, apps can launch up to twice as fast.  From iPhone 5s, introduced in 2013, to the most advanced iPhone ever, iPhone X, iOS 12 brings performance improvements to more devices than any previous version.

64.     The Company also announced iOS 12 at the 2018 WWDC Keynote held at the San Jose McEnery Convention Center with the Company's Senior Vice President of Software Engineering, Defendant Federighi, stating in pertinent part:

> Well now on IOS 12, we're much smarter.  When we detect that you need a burst of performance, like when you begin scrolling or launching an app, we ramp up processor performance instantly to its highest states, delivering high performance and to ramp it down just as fast to preserve battery life.  Now, these are just some of the improvements that are coming to not just our older devices, but the full range of devices, and that's a quick update on performance.[5]

65.     Similarly, at the 2018 WWDC, Defendant Federighi represented that iOS 12 was intended to:

> [D]eliver[] all of these features across such a wide range of devices while maintaining high performance is a challenge we take really seriously, and so for iOS 12, we are doubling down on performance.  We're working top to bottom making improvements, to make your device faster and more responsive, and because we want these changes to be available to the full range of our customers, iOS12 will be available on all the same devices as iOS 11. This is the largest base ever supported by an Apple release. And we're focusing our efforts especially on the oldest devices."[6]

## THE INHERENT DEFECTS IN THE APPLE DEVICES

66.     At all material times, the Company developed and sold devices that contained an inherent mismatch between battery performance and the operational needs of the devices.  Although it is foreseeable that lithium-ion batteries degrade over time, the Company knowingly failed to plan for the power requirements of its devices during the normal life of the battery.

67.     On information and belief, this inadequate planning was the product of the improper design of the batteries (such as their designed margin for degradation), the rated power that the Company's iOS software demanded from the batteries, and/or a combination thereof.  As a result of the defects, the devices were inadequate to meet the power needs of the iOS system for the normal lifetime of a battery.

---

[5] 2018 WWDC Keynote.
[6] 2018 WWDC Keynote.

68.     And because the Company hermetically sealed the defective batteries within the devices, preventing consumers from easily replacing the batteries, the Defects caused even greater harm.

**Key Power Components of the Devices**

69.     The Company's power mismatch stems in part from the premium the Company placed on designing ever "thinner" devices while nonetheless promising "faster" and "stronger" performance with "long" battery life.  This design model places critical limitations on battery size.

70.     The major components are integrated into the device in iPhone 7.

71.     The main printed circuit board (PCB), also called the main logic board, is nestled against the battery.  The integrated circuits and other small components comprising the main logic board are the "brain," so to speak, of the mobile device, and are responsible substantial power usage.[7]

72.     The back side of the logic board houses, among other things, two power management integrated circuits (called PMICs), a primary and a secondary one.  The primary PMIC provides a number of critical functions such as providing voltage rails to the logic board as well as battery charging. This is also where the primary battery management functions tend to reside.[8]

73.     The Company was among the first companies to sell a smartphone with non-user replaceable lithium-ion batteries.  Indeed, "before the iPhone, cell phones without user-replaceable batteries were almost unheard of."[9]

74.     The Company chose to equip its devices with a battery that was not replaceable by users.   Special skills and tools, including a pentalobe screwdriver, are required to replace the lithium-ion batteries in the devices.  The Company also chose not sell replacement batteries directly to consumers and instead requires consumers seeking a new battery to pay for the battery and battery installation by a Company representative.

---

[7] Q Novo, The Anatomy of an iPhone 6, https://qnovo.com/anatomy-of-an-iphone/.
[8] *Id.*
[9] Kyle Wiens, "Apple's Latest 'Innovation' is Turning Planned Obsolescence into Planned Failure," IFixit (Jan. 20, 2011) (available at https://www.ifixit.com/blog/ 2011/01/20/ appleslatestinnovation-is-turning-planned-obsolescence-into-planned-failure).

75.     Critically, the batteries used in the devices require careful handling and packaging, and while rechargeable, there were limits to how often they can be recharged.  Lithium-ion batteries work on ion and electron movement between the positive and negative electrodes.  The primary measure of battery performance is capacity. A lithium-ion battery's capacity is degraded over time by discharge/recharge cycles, elevated temperatures, and aging.

76.     It is known to smartphone manufacturers, including the Company, that lithium-ion batteries degrade over time as the number of discharge/recharge cycles increases.

77.     The Company represents that its battery is "designed to retain up to 80% of its original capacity at 500 complete charge cycles."

78.     This representation, plainly designed to convey to consumers how long the battery in their device should continue to function well, is misleading.  It only tells half of the story.  It may (or may not) be that the Company's batteries retain a certain "capacity" (*i.e.*, how long they could hold a charge before needing to be recharged) once they reach the age of 500 charge cycles, but that says nothing about the rate at which they are able to deliver power at that point in their life.

79.     In truth, the Company's batteries (as designed) degraded quickly, such that they were incapable of delivering the power required to run the devices during the normal life of a lithium-ion battery.

**Apple Compounded the Defects by Stressing**
**Device Batteries With Power-Hungry Software: iOS Updates**

80.     The Company's battery designs were also inadequate because they could not handle the power demands of the software the Company mandated users to run.

81.     When the Company releases a new operating system, it pushes the software directly to the customers' device through a red signal with a number in it that notifies users of the existence of an available "software update."

82.     Within minutes, device owners can click on the prompt and download the new operating system.

83.     It is very difficult, if not impossible, for typical Apple owners to avoid downloading an iOS update.  As one site explains:

> The bad news is there's no easy way to stop iOS from repeatedly throwing this alert at you . . . .
>
> To encourage people to get on the latest version of iOS, Apple implemented a feature called Automatic Downloads.  This download updates in the background, and once it is downloaded, you are pushed to install it.  Apple typically installs the software update at night when the iPhone, or iPad, is plugged in and charging.[10]

84.     Turning off the updates and the daily push notifications requires users to delve deep into their settings or to forgo WiFi, which ordinary customers would not do.[11]

**The Release of iOS 10 Was Secretly Designed to Camouflage the Defects**

85.     In the Fall of 2016, iPhone users reported increasing occurrences of sudden shutdowns of iPhones 5 and 6 running versions of iOS 10 software, including when their devices indicated that battery life was still at or above 30%.[12]  As noted herein, even the inventor of the iPod, Tony Fadell, voiced concern about this problem, commenting that the battery on his own iPhone kept shutting down despite having a significant amount of charge left in it: "It's happening to me every other day-especially while using the mapping app.  Have to always carry an external battery to revive it . . . .  Issue with battery/shutdown algorithms?!"[13]

86.     As the Company was aware, and confirmed with the diagnostic information it obtained, the shutdown problem was the foreseeable consequence of a serious design defect in the Company's iPhones. The speed for which the Company's products are known and marketed to consumers comes from powerful processing units which are supposed to perform calculations and

---

[10] Lucy Hattersley, "How to Stop iOS Nagging You to Update to the Latest Version," MacWorld (July 6, 2016) (available at https://www.macworld.co.uk/how-to/iphone/how-stop-ios-nagging-youupdate-latest-version-3641478).
[11] Hattersly, How to Stop iOS Nagging You, *supra*.
[12] Apple Discussion Thread, https://discussions.apple.com/ message/30989226? start= 165& tstart=0.
[13] Tony Fadell Twitter Comment, Dec. 1, 2016, https://twitter.com/tfadell/ status/ 804232051595640833.

render graphics on its smart-phones at top speeds.  As these processing units become faster and more powerful, however, they also require more power from the phone's battery.

87.     A further complication is that the impedance of lithium-ion batteries used in iPhones increases as the cells age, resulting in both a reduction in overall battery capacity and a reduction in the battery's ability to produce peak power output.[14]

88.     The amount of power that the processing unit requires during its daily operation varies:  sometimes very little; sometimes a great deal; and the battery should be designed and capable of producing enough peak power to keep pace with even the processor's highest demands.

89.     A battery and processor must be designed such that even as the battery ages and loses performance, it will still be capable of meeting the processor's peak power demands for years to come.

90.     Electronics manufacturers like Apple are aware of this fact and thus must design batteries to be more powerful than they need to be so that as they grow weaker, they still have the ability to meet the processor's peak power demands.

91.     For example, the Company's iPhone 6 uses Apple's proprietary A8 System on a Chip ("SoC") as its processor.  This processor has low-power cores and high-power cores.  The low power cores perform most of the day-to-day functions of the iPhone, and the high-power cores handle more graphically intensive activities such as gaming, recording and editing video, running certain applications at other times.

92.     When the high-power cores are active, they can draw peak power from the battery, which the battery should be capable of meeting for the lifetime of the smart-phone.  But when the battery ages and is unable to deliver the peak power demanded by the phone's processor, the processor and phone switch off and will not turn on again until the phone is plugged into the wall.

93.     The shutdown problem iPhone users were experiencing in Fall 2016 thus resulted from a significant design defect: the battery was not designed with enough power to meet the peak

---

[14] Apple, iPhone Battery and Performance, https://support.apple.com/en-us/HT208387.

demands of the phone's processor as the battery aged. The result was that iPhones worked as expected when new, but even after a few months or years, began to cease functioning, *i.e.*, switching off at random intervals, when the iPhone processor required too much power of its flagging iPhone battery.

**Apple Released iOS 10.2.1 to Further Conceal the Defects**

94.     After confirming this defect with the software diagnostics it surreptitiously deployed in user's devices, the Company could have been transparent with its millions of customers and disclosed the defect.  Instead, the Company released iOS 10.2.1 on January 23, 2017 as a seemingly routine update of its operating system.

95.     The alert to download iOS 10.2.1 stated that the update included "bug fixes" and improvements in device security.

96.     Sometime in February 2017, the Company added to its "Read Me" notes the following statement to be displayed on users' iPhones with the software upgrade: iOS 10.2.1 "also improves power management during peak workloads to avoid unexpected shutdowns on iPhone."

97.     On or about February 23, 2017, the Company issued a statement that "[w]ith iOS 10.2.1, Apple made improvements to reduce occurrences of unexpected shutdowns that a small number of users were experiencing with their iPhone."

98.     Throughout 2017, however, the Company failed to inform customers that the "fix" to the shutdown problem in iOS 10.2.1 came with a significant – and undisclosed – tradeoff: the update artificially slowed down the processors in Apple's devices.  The software change the Company introduced with iOS 10.2.1 concerns the "powerd" system, short for "power daemon," which controls CPU and GPU speed and power.  In computer science parlance, the Company concealed within the iOS updates secret commands, which "underclocked" the processors in the affected phones, causing them to perform calculations across the board at a slower rate than the hardware was capable of supporting, and slower than they had operated before the iOS updates.

99.     Running at a slower rate after the update, the processors in Apple's devices would demand less power during peak operation. This diminished requirement for peak power would

reduce and eliminate instances where the processor would outpace its battery, meaning that even in their weakened condition, the older batteries could supply enough peak power to meet the now reduced demands of the processors.  Although this "fix" would prevent outright shutdowns, it would slow the customers' product and would scale, meaning as the batteries continued to grow weaker, the fix would continue to slow the processors so that demand never outpaced available power.

100.    Neither the software update notification nor the software update release notes made any mention of this severe throttling effect.  The Company concealed the problem; the Company concealed the solution; and the Company concealed that its solution would slow its customers' products.

101.    Users of Apple devices immediately began reporting reduced functionality, but there was no way for ordinary consumers to quantify these inklings or give them credence.

102.    As detailed herein, the Company had to continue releasing the "throttling" software in future versions of its iOS as new devices went to market.  On September 19, 2017, the Company released iOS 11.  Immediately upon downloading iOS 11, existing Apple iPhone and iPad users began to experience a marked decrease in battery life on their devices.

103.    One study of thousands of iPhone users within a monitored network compared the relative battery life of existing iPhones operating on iOS 10 versus iOS

104.    This study revealed that existing iPhones operating on the iOS 10 software on average drained to 0% battery after 240 minutes (4 hours), whereas those operating on iOS 11 on average drained to 0% battery after only 96 minutes (just over 1½ hours).  iOS 11 reduced the average iPhone's battery life by more than 60%. The study demonstrates the substantially increased power demands that Apple foist upon users' Devices through its iOS update.

**The Defects in Apple's Devices, and
the Impact of Throttling, Is Evidenced by Independent Analysis**

105.    On December 9, 2017, a Reddit user by the handle "TeckFire" posted online benchmarks (measurements of the speed with which a phone's processor performs its computations) of his iPhone 6 operating on its old battery, and again after he had replaced it with a

new battery.  The iPhone's processor's speed had remarkably increased over 50%.  This was incongruous: a new battery alone should not have had any impact on the processor speed.

106.    On December 18, 2017, spurred by the ensuing discussion from TeckFire's post, John Poole, a software engineer at Primate Labs, published a report based on an analysis of 100,000 iPhones and concluding that the decrease in performance of the affected iPhones was caused by the iOS 10.2.1 and iOS 11.2 updates, and not the normal decreased function that would be caused by an aging battery.[15]

107.    Poole's analysis, which measures computer processing benchmarks, showed that after updating an iPhone 6s to an iOS 11, there were more "cluster points" where performance would slow down.

108.    As Poole explained, "where the peaks happen represents the cluster of phones running at that particular performance level.  And the height of the peaks (in blue) represents the relative frequency of benchmarks being performed at that performance level."  This translates to a real loss of performance.  For example, "the iPhone 6s is slowed down by nearly 60%."  This "effectively turns the device's performance into that of a device 1-2 generations older."[16]

109.    A processor's speed is set, in part, by its clock speed which is measured in Hertz (Hz); the faster a processor is clocked, the faster a processor will normally perform tasks.  For example, the Company advertises the iPhone 6 as having a processor speed of 1.4 GHz.[17]  But benchmark tests run by iPhone 6 users following the iOS 10.2.1 update revealed a processor speed of 600MHz;[18] less than half as fast as Apple advertises.[19]

---

[15] John Poole, "iPhone Performance and Battery Age," *Primate Labs* (Dec. 18, 2017) (available at https://www.geekbench.com/blog/2017/12/iphone-performance-and-battery-age/).

[16] Paulo Santos, "Apple: All You Wanted to Know on the iPhone Throttling Scandal," *Seeking Alpha* (Dec. 26, 2017), (available at https://seekingalpha.com/article/4133931-apple-wanted-knowiphone-throttling-scandal).

[17] 1.4 GHz = 1,400,000,000 Hz.

[18] 600 MHz = 600,000,000 Hz.

[19] Tom Warren and Nick Statt, "Apple confirms iPhones with older batteries will take hits in performance," *The Verge* (Dec. 20, 2017) (available at https://www.theverge.com/ 2017/ 12/20/16800058/apple-iphone-slow-fix-battery-life-capacity).

110.    As noted above, on December 20, 2017, the Company admitted to journalists that the iOS 10.2.1 and iOS 11 software updates included a throttling "feature" to slow down older iPhone models.

111.    Attempting to deflect attention from its misdeed, in connection with its December 2017 "revelations" the Company also asserted: "We now believe that another contributor to these user experiences is the continued chemical aging of the batteries in older iPhone 6 and iPhone 6s devices, many of which are still running on their original batteries."[20]

112.    However, other smart phone manufacturers use similar lithium-ion batteries and have not experienced the same problems or resorted to throttling their phones' performance.  For example, Samsung guarantees its Galaxy S7 and Note & lithium-ion batteries will retain 95% of their capacity for at least two years; likewise, LG and Google warranty their smart phones' batteries for two years. Apple's warranty is shorter:

> Your battery is designed to retain up to 80% of its original capacity at 500 complete charge cycles.  The one-year warranty includes service coverage for a defective battery.  If it is out of warranty, Apple offers a battery service for $79, plus $6.95 shipping, subject to local tax.[21]

## RELATED CASES AND PROCEEDINGS REGARDING
## THE APPLE DEFECTS AND UPDATES

### United States – California State Court

113.    There are currently four (4) related class actions pending in California state courts. *Rosalia v. Apple, Inc.*, CGC-18-564832 (San Francisco), *Tandel v. Apple, Inc.*, 17CIV05874 (San Mateo), *Santino v. Apple, Inc.*, BC690396 (Los Angeles) and *Krueger v. Apple Inc.*, 18CV329447 (Santa Clara).

//

---

[20] Apple website, "A Message to Our Customers about iPhone Batteries and Performance," dated December 28, 2017, available at: https://www.apple.com/iphone-battery-and-performance/.

[21] Apple, Battery Service and Recycling, https://www.apple.com/batteries/service-and-recycling/. The iPad battery warranty is also one year, Apple warrants that "Your battery is designed to retain up to 80% of its original capacity at 1000 complete charge cycles."

**United States – Federal Cases**

114.    Three federal cases have not yet been consolidated with the MDL. Two are *pro se* cases, one pending in New York and one recently transferred to the Northern District of California by the JPML and related to the MDL, but not yet consolidated.  *See Oliver v. Apple Inc*., 5:18-MD-3638-EJD (N.D. Cal.); *see also* JMPL Conditional Transfer Order No. 4 [*Oliver* ECF No. 11]. The third case *(Donahoe v. Apple, Inc.*, 1:18-cv-0763 (N.D. Ohio)) is a class action asserted on behalf of Ohio residents.

**United States – Congressional and Senate Proceedings**

115.    On January 12, 2018, the United States House of Representatives Committee on Energy and Commerce wrote a letter to Apple CEO Tim Cook requesting responses to 13 questions. On February 2, 2018, Apple responded by letter.

116.    On January 10, 2018, the United States Senate Committee on Commerce, Science & Transportation launched an investigation of the defect and the update.  Chairman Sen. John Thune sent a letter to Apple CEO Tim Cook posing eight (8) questions, and during an interview with *CNBC* said:

> They [Apple] just acknowledged after the holidays that this is actually happening, which is an admission that we think is long overdue but that being the case, we at least now want to find out what they are doing to inform consumers. The fact remains there are a lot of unanswered questions about this practice and obviously I think consumers have a right to know and so we're going to make sure that Apple is forthcoming and responsive and we'll take additional steps as necessary.

**United States – Federal Regulatory Proceedings**

117.    On January 30, 2018, *Bloomberg News* reported that both the SEC and the DOJ were independently investigating Apple for how it disclosed information related to the updates.  The agencies have demanded documents and information, according to anonymous sources who spoke to *Bloomberg News*.  Although the agencies declined to comment to the reports, Apple confirmed both investigations, stating "we have received questions from some government agencies and we are responding to them."

**Canada – Regulatory Proceedings**

118.    On March 1, 2018, the Standing Committee on Industry, Science and Technology in the Canadian House of Commons held hearings on the defect and updates.  Those providing testimony included a representative of the Canadian Competition Bureau (Ms. Alexa Gendron-O'Donnell), who confirmed that her office is investigating Apple related to the defect and the update, and that she has the ability to participate in information-sharing with investigators in the United States, France, Israel and South Korea.

119.    Importantly, when Nathaniel Erskine-Smith (Member of Parliament for Beaches-East York) asked Apple to disclose internal communications, opinions or advice given to Apple Canada or Apple Inc. regarding whether the defect should be made public, Apple's representative refused: "I'm not going to make that undertaking . . . If the committee wants to make a direction about things, we'll reconsider.  But the fact is, as people here know, Apple is exposed to a number of class actions in the United States."  Member of Parliament Brian Masse, who pushed for the committee to study the issue, said the reason for his push "was about Canada responding to a problem that is obviously international."

**Canada – Litigation**

120.    On February 23, 2018, plaintiff Cherif Saleh filed a statement of claim in the Ontario Superior Court of Justice against Apple Inc. and Apple Canada Inc. alleging eight common law and statutory counts and seeking damages and punitive damages on behalf of a class of Canadian citizens, excluding Quebec, related to the defect and the software updates.  On March 2, 2018, plaintiff Antonio Gaudio filed a similar statement of claim against Apple, Inc. and Apple Canada, Inc. in the Ontario Superior Court on behalf of a class that includes all persons, corporations, and other entities in Canada, excluding residents of Quebec, who purchased a device.  The plaintiffs in both cases have agreed to cooperate with each other and have temporarily agreed to hold the action in abeyance in favor of MDL 2827 and are willing to discuss having the Canadian court officially stay the actions in favor of MDL 2827 if the stay would comport with the principles of the cross-border notice protocols set forth by the American Bar Association in August 2011.

**Canada – Litigation – Quebec**

121.    On December 29, 2017, Plaintiff Raphael Badaoui filed a class action in Quebec Superior Court (District of Montreal) against Apple Canada Inc. and Apple Inc., Case No. 500-06-000897-179.  The plaintiff is seeking class action status on behalf of all consumers in Quebec who purchased certain Apple devices and were injured as a result of the defect and the updates.

**Israel – Regulatory Proceedings**

122.    On April 9, 2018, the Israeli Consumer Protection and Fair Trade Authority (part of the Economy Ministry) announced that it launched an investigation into Apple for possible breaches of duty to users to disclose that the Updates would slow the performance of certain model iPhones. Rony Friedman, CEO of Apple Israel, was questioned in a private session about whether Apple provided "essential" information on the true purpose and effect of the Software Updates.  The investigation continues.

**Israel – Litigation**

123.    Five class actions have been filed against Apple in Israel.  A hearing was held at the district court in Tel Aviv on April 10, 2018, in which it was agreed that all five class actions will be consolidated and an amended motion for class action would be filed within 90 days (in Israel, the motion for class action precedes the motion to dismiss). As written in the court's decision, the reason for 90 days is to follow after the consolidated amended complaint in the United States.

**France – Criminal Proceedings**

124.    On December 27, 2018, an environmental group called HOP ("Halte à l'Obsolescence Programmée" or "Stop the Programmed Obsolescence") filed a complaint with the Prosecutor of the French Republic asserting counts under Article L. 441-2 of the French Consumer Code (planned obsolescence) and Article L. 441-1 of the Consumer Code (deception) against Apple France.  Article L. 441-2 prohibits "the practice of planned obsolescence that is defined by the use of techniques by which the head of the marketing of a product is to deliberately reduce the life span to increase the replacement rate."  HOP alleged that Apple's purposefully slowdown of iPhones via the updates was done deliberately in violation of the Consumer Code, which is a criminal offense.

1  According to French media, prosecutors accepted the complaint and opened a formal probe on
2  January 5, 2018.

3  **Italy – Regulatory Proceedings**

4  125.  On January 18, 2018, Italy's antitrust enforcer (the Autorit Garante della
5  Concorrenza e del Mercato) ("AGCM") announced that it launched an investigation into consumer
6  complaints that Apple was purposefully slowing certain devices after software updates in order to
7  force Italian citizens to buy news ones, based on faked obsolescence.  The AGCM claims that if the
8  behavior were proven, it would violate Articles 20, 21, 22 and 24 of the consumer code.

9  **China – Regulatory Proceedings**

10  126.  On January 15, 2018, the Xinhua state news agency reported that the Shanghai
11  Consumer Council wrote to Apple asking it to explain the reports of the device defects and slowing
12  caused by the updates.  The Council said it received almost three (3) times as many complaints
13  about Apple products in 2017 compared to just two years prior.  The investigation is continuing.

14  **Russia – Litigation**

15  127.  Starting in January 2018, individual lawsuits were filed against Apple in the
16  Tverskoy (Moscow district) court, led by legal services firm Lex Borealis in Moscow.  Legal
17  funding is reportedly being provided by NLF Group.  Attorneys at Lex Borealis said in a joint
18  statement with NLF Group that in addition to the early suits filed, they were handling "at least
19  several hundred" claims running into "several tens of millions of rubles."  Although the actions
20  started in Moscow, counsel for the early claimants said they would consider similar litigation in the
21  provinces.

22  **South Korea – Litigation**

23  128.  In March 2018, an opt-in class action suit on behalf of more than 60,000 named
24  plaintiffs was filed in Seoul against Apple Inc. and its Korean subsidiary in the Seoul Central
25  District Court, alleging purposeful device degradation.  It set a record for the most number of
26  plaintiffs in a single lawsuit.  It followed two earlier suits by a consumer advocacy group called
27  Citizens United for Consumer Sovereignty brought on behalf of 401 plaintiffs and 122 plaintiffs,

28

respectively.  The plaintiffs are seeking compensation damages on behalf of those customers who opt in (out of approximately 10 million Korean buyers of certain Apple devices).

**South Korea – Regulatory Proceedings**

129.    Following a complaint made by Seoul-based Citizens United for Consumer Sovereignty (the same group discussed above) against Apple CEO Tim Cook and the head of Apple's Korean subsidiary, the Seoul Central District Prosecutors Office opened a formal probe with its intellectual property crime unit. The CUCS claimed that Apple deliberately slowed older model iPhones in order to push Apple customers towards newer, more expensive modes of the company's phones as part of a planned obsolescence strategy.

## FALSE AND MISLEADING STATEMENTS TO THE MARKET

130.    On August 1, 2017, Defendants caused the Company to issue a press release reporting strong financial results for its third fiscal quarter ended July 1, 2017 ("Q3 2017") exceeding analyst estimates.  In this press release, the Company provided revenue guidance for the upcoming quarter of between $49 billion and $52 billion.

131.    On the same day, the Company held an earnings conference call to discuss its Q3 2017 results.  It was during this earnings call that Defendant Cook praised consumer demand for the iPhone 7 while highlighting the product's "highest ever" upgrade rates.  Defendant Cook proceeded to credit this record upgrade rate to "many, many different things," none of which included the intentional throttling of older iPhones.  When asked whether the upgrade rate was sustainable, Defendant Cook stated that "there's a lot of factors that are very positive for [Apple]" and that Apple has "a lot of opportunity."  Defendant Cook stated:

> iPhone results were impressive with especially strong demand at the high end of our lineup.  ***iPhone 7 was our most popular iPhone and sales of iPhone 7 Plus were up dramatically compared to 6s Plus in the June quarter last year.***  The combined iPhone 7 and 7 Plus family was up strong double digits year-over-year.  One decade after the initial iPhone launch, we have now surpassed 1.2 billion cumulative iPhones sold.

> * * *

It's interesting to note that **upgraders through -- both for the quarter and actually for the full fiscal year to date was our highest ever. And so that we felt very good about.**

* * *

The -- from an absolute quantity point of view, **the upgrades for this fiscal year are the highest that we've seen and so we feel good about that**. However, if you look at it from an upgrade rate point of view instead of the absolute number, the rate is similar to what we saw with the previous iPhones, except for iPhone 6, which as we've called out in the past, had an abnormally high upgrade rate.

* * *

I think the **upgrade rate is a function of many, many different things**, from the size of the installed base, the age of the installed base, the product that is new at the time, the regional distribution, the upgrade plans that are in various markets around the world. […] And – but I think in general, because our installed base is -- was up strong double digit once again, **there's a lot of factors that are very positive for us.** And between the upgraders and the switchers that we see and still -- the first-time buyer category is still out here, too, in several countries, including some that you may not think there is, there is still sizable base in some. Between those 3 areas, **I think we have a lot of opportunity**. [Emphasis added].

132.    Defendant Maestri repeated these same statements on iPhone's demand and sales growth during the earnings call:

During the quarter, we sold 41 million iPhones and reduced iPhone channel inventory by 3.3 million units, leaving us with our lowest level of channel inventory in 2.5 years and well within our 5- to 7-week target inventory range. **iPhone sales were up year-over-year in most markets we track**, with many markets in Asia, Latin America and the Middle East growing unit sales by more than 25%. We are very pleased with these iPhone results, especially considering the tough comparison to the June quarter last year when we launched iPhone SE.

**iPhone ASP was $606, up from $595 a year ago, thanks to strong demand for iPhone 7 Plus, which represented a higher percentage of the iPhone mix compared to the Plus model a year ago**. The impact of the stronger mix on ASP was partially offset by negative foreign exchange year-over-year and the reduction in channel inventory, which took place entirely at the high end of the portfolio.

Customer interest and satisfaction with iPhone are very strong with both consumers and business users. In the U.S., the latest data from 451 Research on consumers indicates a 95% customer satisfaction rating for iPhone 7 and 99% for iPhone 7 Plus. **Among consumers planning to buy a smartphone, purchase intention for iPhone was nearly 3x the rate of our closest competitor. Among corporate smartphone buyers, iOS customer satisfaction was 94%. And of those planning to purchase**

*smartphones in the September quarter, 78% plan to purchase an iPhone.* [Emphasis added].

133.    Analysts reacted positively to the Company's statements regarding its 3Q 2017 results.  For instance, on August 2, 2017, J.P. Morgan published a report raising the Company's price target to $176 from $165.

134.    On November 2, 2017, Defendants caused the Company to issue a press release reporting earnings and revenue above analyst estimates for its fourth fiscal quarter ended September 30, 2017 ("Q4 2017").  For Q4 2017, the Company reported above guidance revenue of $52.6 billion and sequential iPhone unit sales growth of 14%.  Defendant Maestri stated in the press release: "Apple's year-over-year revenue growth rate accelerated for the fourth consecutive quarter and drove [earnings per share] growth of 24 percent in the September quarter."  Further, in the press release, the Company set revenue guidance for the upcoming quarter of between $84 billion and $87 billion.

135.    On the same day, the Company held an earnings conference call to discuss its Q4 2017 results.  During the call, Defendant Cook praised the Company's "biggest year ever," "all-time record revenue," and "double-digit unit growth in iPhone."  He further stated Apple's year-over-year increases in upgraders, all while concealing that these upgrades were driven by the Company's undisclosed practice of unlawfully throttling older model iPhones through iOS updates.  Defendant Cook stated:

> *This was our biggest year ever in most parts of the world with all-time record revenue in the United States, Western Europe, Japan, Korea, the Middle East, Africa, Central and Eastern Europe and Asia.*
>
> We had particularly strong finish this year, generating our highest September quarter revenue ever as year-over-year growth accelerated for the fourth consecutive quarter.
>
> Revenue was $52.6 billion, above the high end of our guidance range and up 12% over last year.
>
> * * *
>
> Let me talk a little bit about Q4 in China to give you a little bit of color on the results. The -- we increased market share for iPhone, Mac and iPad during the quarter.  We hit all-time revenue records for services and for Mac in the -- for the PRC during the

quarter. We had very strong iPad revenue growth. ***We had double-digit unit growth in iPhone, and both the upgraders and Android switchers were both up on a year-over-year basis during the quarter***. And so, the results were broad based. They were pretty much across the board, as I indicated. [Emphasis added].

136.    During the call, Defendant Maestri reiterated the Company's iPhone sales growth, adding further that "[c]ustomer interest and satisfaction with iPhone are very strong." Defendant Maestri stated:

> ***During the quarter, we sold 46.7 million iPhones, up 3% over last year***. We were very pleased to see double-digit iPhone growth in many emerging markets, including mainland China, the Middle East, Central and Eastern Europe, India and Mexico. We gained share, not only in those markets, but also in Canada, Germany, France, Italy, Spain, Sweden and Singapore, based on the latest estimates from IDC.
>
> iPhone channel inventory increased by 1.3 million units sequentially to support the launch of iPhone 8 and 8 Plus, significantly less than the increase in the September quarter a year ago. ***Customer interest and satisfaction with iPhone are very strong with both consumers and business users***.
>
> In the U.S., the latest data from 451 Research on consumers indicates a customer satisfaction rating of 97% or higher across all iPhone models. ***Among consumers planning to buy a smartphone in the next 90 days, purchase intention for iPhone was 69%, more than 5x the rate of the closest competitor with a loyalty rate for current iPhone owners of 95% compared to 53% for the next highest brand***. [Emphasis added].

137.    On February 1, 2018, Defendants caused the Company to issue a press release reporting its financial results for its first fiscal quarter of 2018 ended December 30, 2017 ("Q1 2018"), the last period before the battery replacement program would go into full effect. For Q1 2018, the Company reported "all-time record" revenue and sequential iPhone unit sales growth of 66%—unsustainable albeit impressive results caused by throttling-induced iPhone sales. At the same time, the press release provided unexpectedly flat revenue guidance of between $60 billion and $62 billion for the upcoming quarter.

138.    Defendant Cook stated in the press release, commending the "biggest quarter in Apple's history," which he credited to growing iPhone sales. Despite knowledge, Defendant Cook failed to disclose that these record results were artificially accomplished by throttling older model

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

iPhones and, consequently, reflected unsustainable growth.  Defendant Cook stated in the press release:

> We're thrilled to report the biggest quarter in Apple's history, with broad-based growth that included the highest revenue ever from a new iPhone lineup.  iPhone X surpassed our expectations and has been our top-selling iPhone every week since it shipped in November.

139.   Defendant Cook also praised the Company's growth in updated devices in the press release.  Defendant Cook stated the growth in updates was "a testament to the popularity of our products and the loyalty and satisfaction of [Apple's] customers," when, in truth, consumers were essentially forced into updating their impaired devices under the false notion that the updates improved, rather than diminished, the performance of their iPhones.  Defendant Cook stated:

> We've also achieved a significant milestone with our active installed base of devices reaching 1.3 billion in January. That's an increase of 30 percent in just two years, which is a testament to the popularity of our products and the loyalty and satisfaction of our customers.

140.   Further, in the press release, Defendant Maestri reiterated the Company's "all-time record profitability."  Defendant Maestri falsely claimed Apple's record performance during Q1 2018 was "[t]hanks to great operational and business performance," rather than forced iPhone sales.

141.   On the same day, the Company held an earnings conference call to discuss the Company's Q1 2018 results.  It was at the earnings conference call that Defendant Cook stressed the growth in the Company's active installed base, again incorrectly claiming that this growth "speaks to the strength and reliability of our products and our ecosystem as well as the loyalty, satisfaction and engagement of our customers."

142.   Defendant Cook also stated that Q1 2018 was the Company's "fifth consecutive quarter of accelerating revenue growth."   While the Company's growth was "broad-based," Defendant Cook suggested that "a key driver was iPhone, which generated its highest revenue ever."  Even though consumers were essentially forced into purchasing new iPhones, Defendant Cook falsely conveyed these improved sales resulted from the iPhone X's "innovative" "new features."

143.     During the call, an analyst observed the Company's flat guidance and questioned whether the battery replacement program would enlarge iPhone upgrade cycles.  Defendant Cook responded by praising the "fantastic" reliability of the iPhone.  He then proceeded to highlight expansion in the secondary iPhone market as well as growth in active install base, stating "[the] more people on iPhones, the better."  Finally, Defendant Cook stated that Apple "did not consider in any way, shape or form what [the battery replace program] would do to upgrade rates."  The analyst asked and Defendant Cook replied:

**A.M. Sacconaghi** – *Sanford C. Bernstein & Co., LLC., Research Division* – Senior Analyst

I have a question and a follow-up.  You commented on how your installed base over the last couple of years has grown 30%.  And iPhone is clearly the largest component of that.  And so iPhone installed base is probably growing close to that number, perhaps less, call it 20% or 25%.  Yet if we look at iPhone unit growth for fiscal '18, sort of what's implied with your guidance, fiscal '17 and fiscal '16, *it's been relatively flat*.  So you have an installed base that's 20-plus percent higher and a unit growth that's relatively flat, which would suggest that your upgrade rate is going down or your replacement cycle is elongating. And I'm wondering whether you agree with that and whether investors should be worried about that.  And maybe if I could just add one other wrinkle to potentially get your response on is *given consumers' heightened awareness of their ability to replace batteries going forward as opposed to upgrade, isn't that also something that investors should potentially be concerned about in terms of its impact on upgrade rate going forward? And then, believe it or not, I have a follow-up.*

**[Defendant] Cook** I think it's up to investors as to what things they would like to focus on, so I don't want to put myself in a position of that. The way that I look at this, and I -- the numbers you quoted, I have a different view of them. *But generally, what we see with iPhone is the reliability of iPhone is fantastic.* The second -- or the previously owned market has expanded in units over the years.  And you see, in many cases, carriers and retailers having very vibrant programs around trading an iPhone in. And because iPhone has the largest residual rate on it.  It acts as a buffer for the customer to buy a new one, and it winds up with another customer somewhere else that is perfectly fine with having a previously owned iPhone.  And so I view all of that to be incredibly positive. It's more people on iPhones, the better.  [Emphasis added].

144.     On May 1, 2018, Defendants caused the Company to issue a press release reporting its financial results for its second fiscal quarter ended March 31, 2018 ("Q2 2018").  The press release reported "quarterly revenue of $61.1 billion, an increase of 16 percent from the year-ago

quarter." Defendant Cook remarked that this is the Company's "best March quarter ever," while emphasizing "strong revenue growth in iPhone." Defendant Cook further remarked that "[c]ustomers chose iPhone X more than any other iPhone each week in the March quarter, just as they did following its launch in the December quarter."

145. On the same day, the Company held an earnings conference call to discuss the Company's Q2 2018 results. During the call, Defendant Maestri praised consumer demand and satisfaction for iPhones:

> iPhone revenue grew 14% year-over-year with iPhone ASP increasing to $728 from $655 a year ago, driven primarily by the performance of iPhone X, iPhone 8 and iPhone 8 Plus. During the quarter, we sold 52.2 million iPhones, up 3% over last year, and we grew iPhone units by double digits in several markets, including Japan, Canada, Switzerland, Turkey, Central and Eastern Europe, Mexico and Vietnam.
>
> ***Our performance from a customer demand standpoint was even stronger than our reported results as we reduced iPhone channel inventory by 1.8 million units***, 600,000 units more than the March quarter reduction last year. We exited the March quarter within our target range of 5 to 7 weeks of iPhone channel inventory.
>
> ***Our customers are extremely happy with their iPhones***. The latest survey of U.S. consumers from 451 Research indicates that across all iPhone models, the customer satisfaction rating was 95%, and combining iPhone 8, 8 Plus and iPhone X, customer satisfaction was even higher at 99%. And among business buyers who plan to purchase smartphones in the June quarter, 78% plan to purchase iPhones. [Emphasis added].

146. During the call, an analyst asked if the threat of the U.S.-China trade war was impacting demand and if Apple had taken any actions "to preempt any risk of tariffs going forward." Defendant Cook assured that he was "very optimistic" about the two countries futures, stating further that he is "a big believer that the 2 countries together can both win and grow the pie, not just allocate it differently."

147. On July 31, 2018, Defendants caused the Company to issue a press release reporting its financial results for its second fiscal quarter ended June 30, 2018 ("Q3 2018"). The press release reported "quarterly revenue of $53.3 billion, an increase of 17 percent from the year-ago quarter." Defendant Cook stated that this quarter was the Company's "best June quarter ever, and [Apple's]

fourth consecutive quarter of double-digit revenue growth." He also stated that the Company's strong Q3 2018 results "were driven by continued strong sales of iPhone."

148. On the same day, the Company held an earnings conference call to discuss its Q3 2018 results. During the call, analysts questioned whether the battery replacement program was negatively impacting iPhone replacement sales. Defendant Cook rejected the analyst's concern. Defendant Cook repeated that Apple was not analyzing the battery replacement program's potential impact on unit sales. The analyst asked and Defendant Cook replied:

**A.M. Sacconaghi** - Sanford C. Bernstein & Co., LLC., Research Division - Senior Analyst

Okay. Tim, I was wondering if you could just comment a little bit about the health of the smartphone market. Apple's smartphone iPhone units have been relatively flat for 4 years. And I think you've probably been a share gainer during the period, which would suggest, at least at the high end of the market, that is perhaps flat to down. And I'm wondering if you can comment on, a, *whether you believe that and what you think might be happening with replacement cycles and specifically also what impact, if any, you've seen from wider availability and less expensive replacement batteries for iPhones*.

**[Defendant] Cook** *I think the smartphone market is very healthy*. I think it's actually the best market in the world to be in for someone that is in the business that we're in. *So it's an enormous-sized market* and whether it grows -- from our point of view, whether it grows 1% or 2% or 5% or 6% or 10% or shrinks 1% or 2%, it's a great market because it's just huge. And so that's kind of the way that I view that. iPhone revenues are up 20% for the quarter over last year. We're really pleased with that. And if you look at the sort of this cycle, which I'll define as Q1, Q2, Q3 for ease, you'll see that we've grown like mid-single digits and -- on an average weekly sales point of view and, of course, double-digit on ASP. And so I think it's really healthy. In terms of replacement cycles, as I've mentioned I think on a previous call, some replacement cycles are lengthening. I think that the major catalyst for that was probably the subsidy plans becoming a much smaller percentage of total sales around the world than they were at one time. And so I think that some are lengthening and -- but I think for us, the thing that we always have to do is come out with a really great innovative product. And I think that iPhone X shows that when you deliver great innovative product, there's enough people there that would like that, and it can be a really good business. And so that's how I look at that. In terms of the -- our installed base, which is something very important for us as it is one of the key drivers of Services, our active installed base on iPhone grew double digits over last year during the quarter. And so we're thrilled with that. And you can see that carrying through to the Services line, in the -- and the growth that we have there. In terms of batteries, we have never done an analysis internally about how many people decided to get a lower-

priced battery than buy another phone because it was never about that for us. It was always about doing something great for the user. And I think if you treat the users and customers well, then you have a good business over time, and so that's how we look at that.  [Emphasis added].

149.    During the call, an analyst asked Defendant Cook about what he was "seeing in China and how [he was] thinking about it as [he] look[s] forward." Defendant Cook responded by highlighting "double-digit growth in Greater China" and stating that that "none of [Apple's] products were directly affected by the tariffs."

150.    On November 1, 2018, Defendants caused the Company to issue a press release reporting its financial results for its fourth fiscal quarter and year ended September 29, 2018 ("Q4 2018").  In the press release, Defendant Cook praised the Company's "tremendous fiscal 2018" noting that the Company "achieved the strongest revenue and earnings in Apple's history." Defendant Cook stated in the press release: "Over the past two months, [Apple] delivered huge advancements for [its] customers through new versions of iPhone, Apple Watch, iPad, and Mac as well as [its] four operating systems, and [the Company] enter[s] the holiday season with [its] strongest lineup of products and services ever."

151.    On the same day, the Company held an earnings conference call to discuss its Q4 2018 results.  Defendant Maestri again emphasized that the Company had "the strongest lineup ever as [it] enter[ed] the holiday season," justifying "a new all-time record" of "expect[ed] revenue [of] between $89 billion and $93 billion." Defendant Maestri assured the market that this all-time record range accurately "reflect[ed] a number of factors considered."  These considered factors included, according to Defendant Maestri: (i) reverse launch timing of new top end iPhone model, *i.e.*, releasing the more expensive iPhone XS in Q4 2018 and the more affordable iPhone XR in the following quarter; (ii) the impact of foreign exchange due to the strength of the U.S. dollar; (iii) supply and demand uncertainty relating to new products ramping; and (iv) "macroeconomic uncertainty, particularly in emerging markets."

152.    When asked about macroeconomic uncertainty and deceleration in emerging markets, Defendant Cook maintained that those concerns did not encompass the Company's

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Greater China sales growth.  Defendant Cook reassured the market that the Company's growth in Greater China was strong.  Defendant Cook stated:

> To give you a perspective in -- at some detail, our business at India in Q4 was flat. Obviously, we would like to see that be a huge growth. Brazil was down somewhat compared to the previous year.  And so I think -- or at least the way that I see these is each one of the emerging markets has a bit of a different story.  And I don't see it as some sort of issue that is common between those for the most part. In relation to China specifically, I would not put China in that category. Our business in China was very strong last quarter.  We grew 16%, which we're very happy with. iPhone, in particular, was very strong double-digit growth there. Our other products category was also stronger, in fact, a bit stronger than even the company -- overall company number.

153.    During the earning conference call, an analyst questioned how the Company determined the provided revenue range given "all the things that are going on in the world right now," including geopolitical trade maneuvers. Defendant Maestri responded by stressing the Company's strong product lineup for the holiday season, assuring that this strong lineup provided a strong basis for the "record" guidance issued that day.  Defendant Maestri stated:

> …[A]t the revenue level, we started from the fact that we are very, very excited about the lineup of products and services that we have getting into the holiday season. It's the strongest lineup that we've ever had.  And our guidance range, by the way, represents a new all-time quarterly revenue record….

154.    Analysts also questioned how strong demand was for the two new iPhones that started shipping in September 2018—the most expensive iPhones yet, the XS and the XS Max.  The analyst asked whether buyers were holding off until the cheaper XR iPhone rolled out in October. Defendant Cook responded:

> The Xs and Xs Max got off to a really great start, and we've only been selling for a few weeks. The XR, we've only got out there for, I guess, 5 -- 5 days or so at this point and so that it's -- we have very, very little data there. Usually, there is some amount of wait until a product shows -- another product shows up in look, but in -- that -- in looking at the data, on the sales data for Xs and Xs Max, there's not obvious evidence of that in the data as I see it.

155.    During the earnings conference call, Defendant Maestri reported that going forward the Company will no longer provide unit sales numbers.  However, Defendants decided to withhold

unit sales in order to conceal sales declines in the Company's flagship products.  Defendant Maestri reported:

> *…[S]tarting with the December quarter, we will no longer be providing unit sales data for iPhone, iPad and Mac.*  As we have stated many times, our objective is to make great products and services that enrich people's lives and to provide an unparalleled customer experience so that our users are highly satisfied, loyal and engaged. As we accomplish these objectives, strong financial results follow.
>
> *As demonstrated by our financial performance in recent years, the number of units sold in any 90-day period is not necessarily representative of the underlying strength of our business. Furthermore, our unit of sale is less relevant for us today than it was in the past* given the breadth of our portfolio and the wider sales price dispersion within any given product line.  [Emphasis added].

156.    Defendants tried to justify the Company's decision to withhold iPhone unit sales during the earnings conference call, rejecting the suggestion raised by at least one analyst that the reason for concealing unit data was because "iPhone units are going to start going negative . . . [and] it's easy to talk about great  things and not show the details of things that aren't going so great." Defendants Maestri and Cook insisted that revenue and active install base metrics were the more significant metrics that investors should focus on—maintaining that demand was still strong for the Company's more expensive iPhone offerings.  Defendants Cook and Maestri stated:

> **[Maestri:]** *Given the rationale on why we do not believe that providing unit sales is particularly relevant for our company at this point, I can reassure you that it is our objective to grow unit sales for every product category that we have. But as I said earlier, a unit of sale is less relevant today than it was in the past. To give you an example, the unit sales of iPhone at the top end of the line have been very strong during the September quarter. And that's very important because we are attracting customers to the most recent technologies and features and innovation that we bring into the lineup, but you don't necessarily see that in the number that is reported.* And so therefore, we will -- as I said, we'll provide the qualitative commentary when it is important and relevant, but at the end of the day, we make our decisions to -- from a financial standpoint, to try and optimize our revenue and our gross margin dollars. And that, we think, is the focus that is in the best interest of our investors.
>
> **[Cook:]** Jim, let me just add a couple things to that for color. Our installed base is growing at double digit, and so there's no -- *and that's probably a much more significant metric for us from an ecosystem point of view and customer loyalty, et cetera*. The second thing is this is a little bit like if you go to the market and you push your cart up to the cashier and she says or he says, "How many units you have in

there?", it sort of -- it doesn't matter a lot how many units there are in there in terms of the overall value of what's in the cart.

157.    The statements set forth above were materially false and misleading because Defendants knew and failed to disclose or deliberately disregarded:

(a)    that the U.S.-China trade war had negatively impacted demand for iPhones and Apple's pricing power in greater China, one of Apple's most important growth markets;

(b)    that the rate at which Apple customers were replacing their batteries in older iPhones rather than purchasing new iPhones was negatively impacting Apple's iPhone sales growth;

(c)    that, as a result of slowing demand, Apple had slashed production orders from suppliers for the new 2018 iPhone models and cut prices to reduce inventory;

(d)    that unit sales for iPhone and other hardware was relevant to investors and the Company's financial performance, and the decision to withhold such unit sales was designed to and would mask declines in unit sales of the Company's flagship product; and

(e)    that, as a result of the foregoing, Defendants lacked a reasonable basis in fact when issuing the Company's revenue outlook for 1Q19 and/or making the related statements concerning demand for its products, as Apple's business metrics and financial prospects were not as strong as defendants had led the market to believe.

158.    Following the Company's November 1, 2018 earning release and conference call, several securities analysts issued reports indicating that the information had been favorably received by the market and that the market believed the Company was experiencing strong demand, with analysts accepting the Company's reasoning for withholding unit sales and expecting the Company to meet or beat the 1Q19 financial guidance provided that day:

**Canaccord Genuity LLC**:

We believe Apple continues to grow its leading market share of the premium-tier smartphone market with double-digit growth of its installed base and believe the iPhone installed base of new iPhone consumers will exceed 700M exiting C2018.

This impressive installed base should drive strong iPhone replacement sales and earnings, as well as cash flow generation to fund strong long-term capital returns.

We maintain our BUY rating and $250 price target.

. . . We believe demand trends are solid for the three new iPhone models and anticipate strong ASPs and margin trends for the iPhone franchise going forward.

**Piper Jaffray**:

Apple reported Sept. quarter revenue and EPS ahead of the Street (2% and 5%, respectively) . . . .  Revenue guidance for the Dec. quarter is 2% below consensus at the mid-point, with the gross margin outlook at 38.25% (Street at 38.5%). With slightly weaker guidance for the Dec. quarter and the company's indication that it will provide less product level disclosure (no units or ASP), some investors will assume iPhone units are trending poorly. With increasing disclosure coming for services (gross margin), we believe Apple is simply trying to change the focus towards the overall installed base and services revenue per user. Maintain OW, PT remains $250.

**Wedbush**:

Last night Apple delivered FY4Q (Sept.) results which beat the Street from a headline number but slightly missed iPhone unit shipments which was the focus of investors. However the quarter itself took a back seat to the modestly softer December guidance that Cook & Co. gave on the heels of its much anticipated XS/XR iPhone product cycle which remains the linchpin of the Apple story for FY19. That said, the "jaw dropper" last night was when Apple announced it will stop providing units/ASPs for iPhones, Macs and its other product lines. The Street will find this a tough pill to swallow this morning as the transparency of the Cupertino story takes a major dent given that tracking iPhone units has become habitual to any investor that has closely followed the Apple story for the last decade+ and is critical to the thesis. As explained on the conference call we understand the logic of not providing these metrics anymore given that ASPs are all over the map and a slew of new smartphone releases has catalyzed Apple to focus more on overall segment revenue rather than myopic quarterly unit sales. However, the skeptics will point to Apple doing this right at the critical juncture where higher ASPs are making up for slower unit sales which remains the worry and the stock will get hit accordingly this morning. That said, while it's frustrating how Apple (with no warning) decided to pull the plug on unit metrics, our core bull thesis does not change on the story and to some extent is emboldened by the ~$800 ASP story and a robust services business poised to hit $50 billion+ in FY20. . . . While last night's "Houdini-like metrics move" was a stunner, our core bullish thesis on Apple remains unchanged despite the noise this morning. We maintain our OUTPERFORM rating and $310 price target.

### APPLE DISCLOSES ITS TRUE FINANCIAL CONDITION

159.    On January 2, 2019, the Company disclosed the true state of its iPhone sales, particularly in China.  For the first time in 15 years, the Company slashed its prior quarterly revenue

forecast for the already complete 1Q19 amid falling iPhone sales in China, its third-largest market after the United States and Europe.

160.    In a "Letter from Tim Cook to Apple Investors," the Company reported that its 1Q19 revenues were only $84 billion, far below the expected range of $89 billion to $93 billion the Company had announced just eight weeks earlier on November 1, 2018.  Discussing why the Company had experienced what was characterized as "fewer iPhone upgrades than [it] had anticipated," the Letter blamed the Chinese economy and the cheap battery replacements:

**Emerging Market Challenges**

While we anticipated some challenges in key emerging markets, we did not foresee the magnitude of the economic deceleration, particularly in Greater China. In fact, most of our revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China across iPhone, Mac and iPad.

China's economy began to slow in the second half of 2018. The government-reported GDP growth during the September quarter was the second lowest in the last 25 years. We believe the economic environment in China has been further impacted by rising trade tensions with the United States. As the climate of mounting uncertainty weighed on financial markets, the effects appeared to reach consumers as well, with traffic to our retail stores and our channel partners in China declining as the quarter progressed. And market data has shown that the contraction in Greater China's smartphone market has been particularly sharp.

* * *

**iPhone**

Lower than anticipated iPhone revenue, primarily in Greater China, accounts for all of our revenue shortfall to our guidance and for much more than our entire year-over-year revenue decline. In fact, categories outside of iPhone (Services, Mac, iPad, Wearables/Home/Accessories) combined to grow almost 19 percent year-over-year.

While Greater China and other emerging markets accounted for the vast majority of the year-over-year iPhone revenue decline, in some developed markets, iPhone upgrades also were not as strong as we thought they would be. While macroeconomic challenges in some markets were a key contributor to this trend, we believe there are other factors broadly impacting our iPhone performance, including consumers adapting to a world with fewer carrier subsidies, US dollar strength-related price increases, and some customers taking advantage of significantly reduced pricing for iPhone battery replacements.

161.    Though the Company did not conduct a conference call on January 2, 2019, Defendant Cook appeared on *CNBC*.  Discussing the reference to "rising trade tensions" in the Letter, Defendant Cook expressly stated that:

> [A]s we look at what's going on in China – it's clear that the economy begins to slow there for the second half.  And what I believe to be the case is the trade tensions between the United States and China put additional pressure on their economy.  And so we saw, as the quarter went on, things like traffic in our retail stores, traffic in our channel partner's stores, the reports of the smartphone industry contracting, particularly bad in November – I haven't seen the December number yet, but I would guess that would[n't] be good either.  And so that's what we seen.

> \* \* \*

> [M]y sense is the much larger issue is the slowing of the economy and then this – the trade tension that's further pressured.

162.    Defendant Cook also emphasized the negative impact the battery replacement program had had on the pace of phone replacements during 1Q19:

> [S]ort of in addition to those two things, we've started a program worldwide where we dramatically lowered the battery replacement price. And so we have sort of a collection of items going on, some that are macroeconomic and some that are Apple specific . . . .

163.    The price of the Company stock plunged on this news, falling more than $15 per share, or more than 9%, from its close of $157.92 per share on January 2, 2019 to close at $142.19 per share on January 3, 2019, on unusually high volume of more than 91.1 million shares traded, the highest one-day trading volume experienced by the Company in nearly two years.

164.    On January 3, 2019, *Yahoo Finance* published an article, entitled "Apple's mindblowing warning means CEO Tim Cook now has a major credibility problem," reporting that "Apple CEO Tim Cook and his management team should read the coverage of their mind-blowing warning to every investor on the planet on Apple News and then ask: 'Should investors trust us right now? And, how can we regain that trust.'" The article stated in pertinent part as follows:

> They failed to keep it real with investors on what they were seeing in iPhone demand data late in 2018. Simply no longer providing unit sales data wasn't enough of a signal to investors that something was wrong, bottom line.

As a result, Apple's stock could be "broken" until credibility is restored. "Apple's stock is now at a crossroads. Some investors will consider the stock broken and never reward it with a "proper" multiple, but we've followed the company long enough to know there is cyclicality in the market's relationship with Apple," cautions long-time Apple analyst Gene Munster of Loup Ventures.

**A poor job done with guidance**.

Apple said in a filing released after market close Wednesday that it now sees first quarter revenue of about $84 billion. It previously anticipated $89 billion to $91 billion. In the filing, Cook attributed the reduced guidance to weakness in emerging markets and in Greater China as well as supply constraints on new products. Cook also hinted strongly that Apple felt resistance from consumers to the new $1,000 plus iPhone XS line.

## DUTIES OF DEFENDANTS

165.   By reason of their positions as officers, directors, and/or fiduciaries of Apple and because of their ability to control the business and corporate affairs of Apple, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Apple in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Apple and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

166.   Each director and officer of the Company owes to Apple and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

167.   Defendants, because of their positions of control and authority as directors and/or officers of Apple, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements

issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Apple, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Apple.

168.   To discharge their duties, the officers and directors of Apple were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Apple were required to, among other things:

a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)   remain informed as to how Apple conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)   ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

169.   Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of

1   due care and diligence in the management and administration of the affairs of the Company, as

2   well as in the use and preservation of its property and assets.  The conduct of Defendants

3   complained of herein involves a knowing and culpable violation of their obligations as directors

4   and officers of Apple, the absence of good faith on their part, and a reckless disregard for their

5   duties to the Company and its shareholders that Defendants were aware or should have been

6   aware posed a risk of serious injury to the Company.

7         170.    Each director and officer of the Company owed to Apple the fiduciary duty to

8   exercise due care and diligence in the administration of the affairs of the Company and in the use

9   and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

10   In addition, as officers and/or directors of a publicly held company, Defendants had a duty not to

11   advance their own personal, financial, or economic interests over, and at the expense of, the

12   Company's public shareholders, or to allow other Apple directors, officers, and/or employees to do

13   so.  Each director and officer of the Company also owed Apple and its shareholder-owners the duty

14   to maintain the Company's confidential information and prevent others from misappropriating

15   and/or trading while in possession of the Company's proprietary, confidential information.

16         171.    Defendants breached their duties of loyalty and good faith by causing the Company

17   to misrepresent the information as detailed *infra.* Defendants' subjected the Company to the costs

18   of defending and the potential liability from a class action lawsuit for violations of the federal

19   securities laws.  As a result, Apple has expended, and will continue to expend, significant sums of

20   money.

21         172.    Defendants' actions have irreparably damaged Apple's corporate image and

22   goodwill.

### IN REPURCHASING STOCK, APPLE RELIED ON DEFENDANTS COOK AND MAESTRI'S FALSE OR MISLEADING STATEMENTS

25         173.    Throughout the relevant period, Apple justifiably expected Defendants Cook and

26   Maestri to disclose material information as required by law and SEC regulations in the Company's

27   periodic filings with the SEC and in statements made to the investing public.  Apple would not have

purchased its securities at artificially inflated prices had Defendants Cook and Maestri disclosed all material information known to them or that was so obvious it should have been known to them, as detailed herein.  Thus,

### DEMAND FUTILITY ALLEGATIONS
### FOR THE BOARD OF APPLE

174.    Plaintiff will adequately and fairly represent the interests of Apple and its shareholders in enforcing and prosecuting its rights.

175.    Plaintiff brings this action derivatively in the right and for the benefit of Apple to redress injuries suffered and to be suffered by Apple because of the breaches of fiduciary duty by Defendants.

176.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board of Apple to institute this action against Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

177.    The Apple Board is currently comprised of Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, *four* (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

178.    Defendants face a substantial likelihood of liability in this action because they caused Apple to issue false and misleading statements concerning the information described herein. Because of their advisory, executive, managerial, and directorial positions with Apple, Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

179.    Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for Apple shareholders.

180.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

181.     Any suit by the Board to remedy these wrongs would likely expose the Company to further violations of the securities laws that would result in civil actions being filed; thus, the Board members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

182.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

183.     Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## DEFENDANTS ARE NOT INDEPENDENT

**Defendant Cook**

184.     Defendant Cook is the CEO of the Company.  Defendant Cook is also a Director of the Company.

185.     Defendant Cook is not disinterested or independent, and therefore, is incapable of considering demand because Cook (as CEO) is an employee of the Company who derived substantially all of his income from his employment with Apple, making him not independent. As such, Cook cannot independently consider any demand to sue himself for breaching his

fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

186.     This lack of independence and financial benefits received by Defendant Cook renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

187.     Defendant Cook is also a defendant in the securities class action entitled *City of Roseville Employees' Retirement Sys. v. Apple, Inc., et al.*, Case 4:19-cv-02033-YGR (N.D. Cal.).

**Defendants Gore, Iger, and Jung**

188.     Defendants Gore, Iger, and Jung are members of the N&CG Committee.

189.     The N&CG Committee was charged with monitoring compliance with the Company's Code, which requires these Defendants to focus on the Company's consumers, and to demonstrate honesty, integrity, and courtesy in every interaction with those consumers.

190.     Defendants Gore, Iger, and Jung breached their fiduciary duties of due care, loyalty, and good faith, because as members of the N&CG Committee, *inter alia*, they allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the deficiencies described above.  Therefore, Defendants Gore, Iger, and Jung face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon him is futile.

**Defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner**

191.     Defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner breached their fiduciary duties of loyalty by making improper statements in the Company's press releases, SEC filings, and during earnings calls concerning Apple's sales growth, iPhone demand, and future financial prospects. As a result, Defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner face a substantial likelihood of liability. Therefore, demand upon them is futile.

//

//

**Defendants Levinson, Bell, Sugar, and Wagner**

192.    Defendants Levinson, Bell, Sugar, and Wagner are members of the Audit and Finance Committee.

193.    The Audit and Finance Committee's Charter provides that it is responsible for compliance with accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Further, these Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, these Defendants caused these improper statements.

194.    The Audit and Finance Committee Charter provides that it is responsible for reviewing and discussing with management significant business risks facing the Company, including business, legal, and reputational risks.  Thus, these Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.

## FIRST CAUSE OF ACTION

### (Against Defendants For Breach of Fiduciary Duty)

195.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

196.    Defendants owed and owe Apple fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Apple the highest obligation of good faith, fair dealing, loyalty and due care.

197.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

198.    Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Apple has sustained significant and actual damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

200.    Plaintiff, on behalf of Apple, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment)

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Apple in the form of salaries, bonuses, and other forms of compensation.

203.    Plaintiff, as a shareholder and representatives of Apple, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## THIRD CAUSE OF ACTION

### (Against Defendants for Abuse of Control)

204.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

206.    As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

207.    As a result of the misconduct alleged herein, Defendants are liable to the Company.  Plaintiff, on behalf of the Company, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**(Against Defendants for Waste of Corporate Assets)**

208.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company had a material weakness in its internal control over financial reporting; (ii) the Company's disclosure controls and procedures were not effective; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

210.    Further, during the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose or deliberately disregarded: (a) that the U.S.-China trade war had negatively impacted demand for iPhones and Apple's pricing power in greater China, one of Apple's most important growth markets; (b) that the rate at which Apple customers were replacing their batteries in older iPhones rather than purchasing new iPhones was negatively impacting Apple's iPhone sales growth; (c) that, as a result of slowing demand, Apple had slashed production orders from suppliers for the new 2018 iPhone models and cut prices to reduce inventory; (d) that unit sales for iPhone and other hardware was relevant to investors and the Company's financial performance, and the decision to withhold such unit sales was designed to and would mask declines in unit sales of the Company's flagship product; and (e) that, as a result of the foregoing, defendants lacked a reasonable basis in fact when issuing the Company's revenue outlook for 1Q19 and/or making the related statements concerning demand for its products, as Apple's business metrics and financial prospects were not as strong as Defendants had led the market to believe.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.  Despite this artificial inflation in the price of the Company's shares, the Director Defendants caused and/or allowed

the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

211. As a result of the waste of corporate assets, Defendants are each liable to the Company.

212. Plaintiff, on behalf of the Company, has no adequate remedy at law.

### FIFTH CAUSE OF ACTION

**(Against Defendants for Violations of
Section 10(b) of the Exchange Act and SEC Rule 10b-5)**

213. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

214. During the relevant period, the Director Defendants disseminated or approved public statements that failed to disclose or deliberately disregarded: (a) that the U.S.-China trade war had negatively impacted demand for iPhones and Apple's pricing power in greater China, one of Apple's most important growth markets; (b) that the rate at which Apple customers were replacing their batteries in older iPhones rather than purchasing new iPhones was negatively impacting Apple's iPhone sales growth; (c) that, as a result of slowing demand, Apple had slashed production orders from suppliers for the new 2018 iPhone models and cut prices to reduce inventory; (d) that unit sales for iPhone and other hardware was relevant to investors and the Company's financial performance, and the decision to withhold such unit sales was designed to and would mask declines in unit sales of the Company's flagship product; and (e) that, as a result of the foregoing, defendants lacked a reasonable basis in fact when issuing the Company's revenue outlook for 1Q19 and/or making the related statements concerning demand for its products, as Apple's business metrics and financial prospects were not as strong as Defendants had led the market to believe. Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants. Despite this artificial inflation in the price of the Company's shares, the Director Defendants caused and/or allowed the Company to

1    repurchase many millions of shares of Company stock, thereby causing financial harm to the
2    Company.

3        215.    On May 1, 2018, the Company announced the Board had authorized a program
4    to repurchase up to $100 billion of the Company's common stock, of which $29.0 billion had
5    been utilized as of September 29, 2018.

6        216.    During 2018, the Company spent $73.1 billion to repurchase shares of its
7    common stock and paid dividends and dividend equivalents of $13.7 billion.

8        217.    During 2017, the Company spent $33.0 billion to repurchase shares of its
9    common stock and paid dividends and dividend equivalents of $12.8 billion. The $210 billion
10   share repurchase program was completed in the third quarter of 2018.

11       218.    As alleged herein, Director Defendants acted with conscious misbehavior or
12   recklessness in that they knew or should have known that the public documents and statements
13   issued or disseminated in the name of the Company were materially false and misleading; knew
14   that such statements or documents would be issued or disseminated to the investing public; and
15   knowingly and substantially participated or acquiesced in the issuance or dissemination of such
16   statements or documents as primary violations of the federal securities laws.

17       219.    Director Defendants knew and/or recklessly disregarded the false and misleading
18   nature of the information which they caused to be disseminated to the investing public. The
19   scheme described herein could not have been perpetrated during the relevant period without the
20   knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels
21   of the Company, including the Director Defendants.

22       220.    The Director Defendants were each members of Apple's Board during the
23   aforesaid time period.  Based on their roles at Apple, each of the Director Defendants would
24   have been involved with, or knowledgeable about, the wrongdoing alleged herein.

25       221.    At a minimum, the Director Defendants failed to review or check information that
26   they had a duty to monitor or ignored obvious signs that their statements were materially false
27   and misleading or contained material omissions. Given the nature and extent of the problems at

28

Apple, the Director Defendants knew and/or recklessly disregarded the extent and scope of their statements during the relevant period.

222. Likewise, the Officer Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Officer Defendants had authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

## SIXTH CAUSE OF ACTION

### (Derivative Claim for Violations of
### Section 20(a) of the Exchange Act Against Defendant Cook)

223. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

224. This Count is asserted on behalf of the Company against Defendant Cook for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

225. During his tenure as CEO, Defendant Cook was a controlling person of all officers of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of his control, Defendant Cook had the power and authority to direct the management and activities of the other Company officers, to hire and fire the other Company officers at whim, and to cause the other Company officers to engage in the wrongful conduct complained of herein. Defendant Cook was able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the relevant period, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

226.    In his capacity as the senior executive, and a Board member of Apple, Defendant Cook had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendant Cook agreed with his course of conduct.

227.    As a result of the foregoing, Defendant Cook, individually, was a controlling person of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

228.    As a direct and proximate result of Defendant Cook's conduct, the Company suffered damages in connection with its purchase of Apple common stock at materially inflated prices.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff pray for relief and judgment as follows:

A.    Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, waste of corporate assets and violations of Sections 10(b) and 20(a) of the Exchange Act;

B.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

C.    Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: September 20, 2019              /s/ *Jonathan K. Levine*

Jonathan K. Levine (SBN 220289)
Elizabeth C. Pritzker (SBN 146267)
**PRITZKER LEVINE LLP**
180 Grand Avenue, Suite 1390
Oakland, CA 94612
Tel:    (415) 692-9772
Fax:    (415) 355-6110
Email:  jkl@pritzkerlevine.com
Email:  ecp@pritzkerlevine.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Thomas J. McKenna (*pro hac* pending)
Gregory M. Egleston (*pro hac* pending)
**GAINEY McKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:      (212) 983-1300
Fax:      (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

1

2

3

4

5

6

7

8

9

## **VERIFICATION**

I, ALAN BANKHALTER, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Apple, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Apple, Inc. common stock at all relevant times.

10

11

9/12/19

ALAN BANKHALTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1